UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHNSON & JOHNSON, ETHICON, INC., and
ETHICON US, LLC,

        Plaintiffs,

v.                               Case No. 8:19-cv-1673-T-33AEP

XS SUPPLY, LLC, JON M. BIRD, TYLER
BERGER, IVAN RODIMUSHKIN, DAVID W.
LONGDUE III, and BRENDAN THOMAS,

        Defendants.

_____/

**<u>SEIZURE ORDER</u>**

       Upon consideration of the Complaint of Johnson & Johnson, Ethicon, Inc., and Ethicon US, LLC (together, "Ethicon" or "Plaintiffs"), the accompanying declarations and the exhibits annexed hereto, and the memorandums of law submitted in support of this Order, it is hereby:

       ORDERED, the portion of Plaintiffs' original motion seeking an *ex parte* seizure order (Doc. 3) is DENIED AS MOOT.  Plaintiffs' Renewed Emergency Motion for an *Ex Parte* Seizure Order (Doc. 21) is GRANTED to the extent contained herein.

       ORDERED, Plaintiffs shall post a surety bond in the amount of $25,000 with this Court.

       ORDERED, the United States Marshal for this district or any federal district in which Plaintiffs are authorized to enforce this Order, the state and local police, local deputy sheriffs, and any other law enforcement personnel, and in all cases assisted by one or more attorneys, private investigators, or agents of Plaintiffs, are directed and permitted, at any time between the hours of 8:00 a.m. and 11:00 p.m., to search, seize, copy, and sequester at any time, but no later than seven days (7) from the date of this Order, the following items in the possession, custody, or control of Defendants XS Supply, LLC, Jon M. Bird, Tyler Berger, Ivan Rodimushkin, David

W. Longdue III, and Brendan Thomas (together, "Defendants"), located at 10360 72nd Street, Largo, Florida 33777, and any warehouse, storage unit, office, truck, van, car, storage facility or other location in their possession, custody or control:

(a)      All products bearing the SURGICEL mark (as defined below);

(b)      All business records, invoices, correspondence, e-mails, instant messages, text messages, electronic communications, photographs, bank records, cancelled checks, wire transfers, books of account, receipts, or other documentation relating or referring in any manner to the manufacture, promotion, publicity, advertising, receiving, acquisition, importation, return, shipment, purchase, sale, offer for sale, or distribution of any merchandise bearing the SURGICEL mark, whether such information is stored in a written or computerized form;

(c)      Any equipment and supplies used to manufacture, assemble, label or package any merchandise bearing the SURGICEL mark; and it is further

ORDERED, that Plaintiffs, on whose behalf the Court issues this Order, will serve as substitute custodian and shall hold, inspect, and account completely for all property seized pursuant to this Order and shall compile a written inventory of all such property and shall provide a copy to the law enforcement authority conducting the seizure, to Defendants, and to the Court, except with respect to any electronic evidence seized.  UnitedLex shall act as substitute custodian for all electronic evidence seized, and no search of the seized electronic evidence shall occur until a hearing on this seizure has been completed and an appropriate protective order regarding any confidential information contained therein or thereon has been entered; and it is further

ORDERED, that Plaintiffs' private investigators and attorneys are authorized under the supervision and with the assistance of law enforcement authority to take all necessary steps to secure and remove the property described in the preceding paragraphs and located at the

addresses stated herein including but not limited to breaking open, searching, and entering the premises, or vehicle, or facility in the possession, custody, or control of Defendants, and to inspect the contents of any rooms, closets, cabinets, safes, vehicles, containers, desks, electronic storage devices, computer drives, desktop computers, laptop computers or documents located on the premises or any storage rooms located within the same complex as the premises; and that Defendants and their employees shall provide all keys, passwords or codes needed to inspect the contents of any rooms, closets, cabinets, safes, vehicles, containers, desks, electronic storage devices, mobile phones, computer drives, desktop computers, laptop computers, or documents located on the premises or any storage rooms located within the same complex as the premises; and it is further

ORDERED, that Plaintiffs' attorneys may accompany the law enforcement officers to determine whether an item is covered by the preceding paragraphs and the law enforcement officers shall follow such attorneys' determination; and it is further

ORDERED, that Defendants shall provide to Plaintiffs' attorneys a summary document or documents giving the location or locations of any merchandise bearing the SURGICEL mark that is in the possession custody or control of any of the defendants so that that merchandise can be seized pursuant to this Order; and it is further

ORDERED, that Plaintiffs' attorneys may be accompanied by private investigators and/or computer technicians to obtain copies of documents to be seized that are stored on paper or in computerized form and Plaintiffs' attorneys may also bring with them still camera or video camera operators to record the seizure; and it is further

ORDERED, that the computer technicians and private investigators may scan, image or copy any paper or electronically stored information in the possession, custody or control of

Defendants so that the information may be searched following the seizure for relevant information; and it is further

ORDERED, that Plaintiffs shall, following the seizure, inspect the items seized bearing the SURGICEL mark, and if any items are found to be genuine, such items are to be returned; and it is further

ORDERED, that Plaintiffs shall be responsible to the law enforcement officers for all of their fees and charges incurred in carrying out this Order and shall hold harmless law enforcement authority and its employees for any and all claims, asserted in any court or tribunal, arising from any acts, incidents, or occurrences in connection with the seizure and possession of Defendant's property, including any third-party claims; and it is further

ORDERED, that anyone interfering with the execution of this Order is subject to arrest by law enforcement authority; and it is further

ORDERED, that the parties shall appear for a hearing before this Court to confirm this Seizure Order on July 29, 2019 at 10:00 a.m. in Courtroom 10A at the Sam M. Gibbons United States Courthouse, 801 North Florida Avenue, Tampa, Florida; such date not being sooner than ten (10) days from the date of this Order and not later than fifteen (15) days from the date of this Order, absent good cause or consent of all parties; and it is further

ORDERED, that any defendant intending to oppose confirmation of this Order shall file opposition papers with this Court and personally serve by e-mail upon Plaintiffs' counsel, Geoffrey Potter, Patterson Belknap Webb & Tyler LLP, Gpotter@pbwt.com, on or before July 24, 2019, and reply papers shall be filed and served on or before July 26, 2019; and it is further

ORDERED, that pending the hearing to confirm the seizure authorized herein, the Clerk of this Court is to keep and maintain under seal all papers filed in this action, including this Seizure Order and the Complaint, and that public scrutiny of such papers shall not be permitted,

subject to Defendants' right to access such papers upon presenting the Clerk of this Court with proper identification after the seizure authorized herein has been carried out; and it is further

ORDERED, that Defendants shall, immediately upon service of this Order, deliver by e-mail or by hand upon Plaintiffs' counsel, Geoffrey Potter, Patterson Belknap Webb & Tyler LLP, Gpotter@pbwt.com, a summary document showing the dates, quantities, names, addresses and phone numbers of all suppliers and customers for the preceding twenty-four (24) months from whom they have purchased or to whom they have sold any products bearing the SURGICEL mark; and it is further

ORDERED, that Defendants personally serve upon Plaintiffs' counsel, Geoffrey Potter, Patterson Belknap Webb & Tyler LLP, at their offices at 1133 Avenue of the Americas, New York, New York 10036, on or before July 24, 2019, copies, to the extent that the originals were not seized and sequestered, of all business records, inventory records, invoices, e-mails, text messages, instant messages, electronic communications, bank records, wire transfers, correspondence, books of account, letters of credit, receipts, or other documentation relating or referring in any manner to the manufacture, promotion, publicity, advertising, receiving, acquisition, importation, shipment, purchase, sale, offer for sale, or distribution of any merchandise bearing the SURGICEL mark, the Ethicon trademarks, and/or the SURGICEL Trade Dress (as defined below), whether such information is stored in a written or computerized form, and any merchandise bearing the SURGICEL mark that are in the possession, custody, or control of any defendant; and it is further

ORDERED, that service of the Summons and Complaint and this Seizure Order shall be made at the time of the seizure by delivering true copies thereof to any person of suitable age found at the premises and that such service be deemed sufficient service.

The Court has granted the foregoing Seizure Order without prior written or oral notice to Defendants for the reasons set forth below:

(a)     The entry of any Order other than a Seizure Order without notice will not serve to adequately achieve the objectives underlying the Trademark Counterfeiting Act of 1984;

(b)     Plaintiffs have not publicized their proposed Seizure Order;

(c)     Plaintiffs have provided the United States Attorney for the Middle District of Florida with notice of their application for a Seizure Order pursuant to 15 U.S.C. § 1116(d)(2);

(d)     Plaintiffs have provided the Court with substantial evidence that Defendants have used a counterfeit mark in connection with the sale, offering for sale, or distribution of counterfeit goods;

(e)     Plaintiffs will incur immediate and irreparable injury if this Court declines to grant a Seizure Order without notice;

(f)     The matters subject to said Seizure Order likely will be located at the locations to be searched;

(g)     The harm to Plaintiffs should this Court decide not to grant Plaintiffs' motion for a Seizure Order outweighs any harm which Defendants may incur in the event this Court grants Plaintiffs' motion for a Seizure Order; and

(h)     Defendants, or persons acting in concert with them, would likely destroy, move, hide, or otherwise make inaccessible to the Court the matters which are subject to the proposed Seizure Order if Plaintiffs are required to proceed on notice.

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

The Court issues the foregoing Seizure Order based upon the findings of fact and conclusions of law set forth below.

6

<u>Findings of Fact</u>

**<u>Ethicon's SURGICEL® Absorbable Hemostat Products</u>**

Ethicon has been selling SURGICEL® products for nearly 60 years.  (Decl. of Ben Russo, dated July 9, 2019 ("Russo Decl.") ¶ 3.)  SURGICEL® products are hemostats, or surgical tools used to control bleeding.  (*Id*.)  The SURGICEL® family of products includes what is now branded as the SURGICEL® Original Absorbable Hemostat, as well as other products.  (*Id.* ¶ 4.)

SURGICEL® products are made out of oxidized regenerated cellulose, a material that has several qualities that are useful for surgery.  (*Id*.)  First, SURGICEL® is useful in controlling bleeding during surgery.  (Decl. of Benjamin D. Fitz, dated July 10, 2019 ("Fitz Decl.") ¶ 4.)  Second, SURGICEL® is absorbable in the body, so it can be left inside of the patient after surgery.  (*Id.*)  Third, SURGICEL® acts as an antimicrobial agent.  (*Id.*)  Each of these three features—the hemostatic properties, the absorbable properties, and the antimicrobial properties—are important in surgeries.  Notably, all of these properties are attributable to the oxidized state of the regenerated cellulose material used to make SURGICEL® products.  (*Id.* ¶ 5.)  Regenerated cellulose fiber that is not oxidized does not have hemostatic or antimicrobial properties and it is not absorbable in the body.  (*Id.*)

When it launched in 1957, SURGICEL® was the first oxidized regenerated cellulose hemostat available on the market, setting a new standard of care for controlling bleeding in certain procedures.  (Russo Decl. ¶ 3.)  The SURGICEL® brand is the #1 trusted brand of adjunctive hemostats and is widely trusted by surgeons for its consistent safety and performance.  (*Id.* ¶ 4.)  SURGICEL® products are used in millions of procedures a year and have been used more than 150 million times worldwide.  (*Id.* ¶ 5.)

All authentic SURGICEL® Original distributed in the United States is manufactured, according to a specific and consistent formula, at a factory located in Neuchatel, Switzerland. (*Id.* ¶ 16.)  This state-of-the-art facility has rigorous quality control, specialized equipment, and consistent processes to produce a product that surgeons can rely on to be the same material in each package.  (*Id.*)  Ethicon also uses a factory located in San Lorenzo, Puerto Rico, which manufactures a number of SURGICEL® products, including SURGICEL® Original for distribution in certain regions outside of the United States.  (*Id.*)  In addition to direct sales, Ethicon distributes SURGICEL® in the United States through a specific set of authorized distributors, who then sell the product to healthcare facilities such as hospitals for use in surgical procedures.  (*Id.* ¶ 17.)  Through these controls and others, Ethicon seeks to safeguard the reputation for safety, reliability, and quality that SURGICEL® products have developed over nearly 60 years.  (*Id.* ¶ 18.)

**Trademarks Used on SURGICEL® Products**

Plaintiff Johnson & Johnson, Ethicon's parent, is the owner of the following well-established famous and registered trademarks that appear on the packaging of genuine SURGICEL® (*id.* ¶ 6):

- Ethicon's "Surgicel" trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on August 4, 1959, as U.S. Registration No. 682773.  (*Id.*; Decl. of Geoffrey Potter, dated July 10, 2019 ("Potter Decl.") ¶ 3 & Ex. 1.)

- Ethicon's "Ethicon" trade trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on June 3, 1958, as U.S. Registration No. 662658.  (Russo Decl. ¶ 9; Potter Decl. ¶ 3 & Ex. 1.)

- Ethicon's **ETHICON** trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on December 14, 1954, as U.S. Registration No. 599432.  (Russo Decl. ¶ 10; Potter Decl. ¶ 3 & Ex. 1.)

In addition, Ethicon uses distinctive packaging (the "SURGICEL Trade Dress") to distinguish its SURGICEL® product in the marketplace.  (Russo Decl. ¶ 12.)  Ethicon is the owner of the SURGICEL Trade Dress, which consists of, but is not limited to, the packaging illustrated below:



(*Id.*)  Ethicon has used and is currently using these trademarks and trade dress in commerce and in connection with its sale of SURGICEL® and plans to continue such use in the future.  (*Id.* ¶¶ 6, 11, 13.)  Ethicon prominently displays them in its advertising and promotional materials. (*Id.* ¶¶ 7, 11, 13.)

Ethicon has engaged and continues to engage in activities designed to promote SURGICEL® and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States.  (*Id.* ¶ 14.)  The SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress symbolize business goodwill of Ethicon and are invaluable assets to Ethicon.  (*Id.* ¶ 15.)

**Discovery of Counterfeit SURGICEL® at the University of Kentucky**

In May 2019, Ethicon received a number of complaints of defective SURGICEL® product at the University of Kentucky Medical Center.  (Decl. of Kate Reichenbach, dated July 9, 2019 ("Reichenbach Decl.") ¶¶ 3-13.)  A sample of those products has been tested and

Ethicon has established that it is counterfeit.  (Decl. of Daniel Burkley, dated July 9, 2019 ("Burkley Decl.") ¶ 7.)

On May 10, 2019, a neurosurgeon at the University of Kentucky Medical Center noticed a problem with a SURGICEL® Absorbable Hemostat while performing brain surgery. (Reichenbach Decl. ¶ 3.)  The surgeon and his technicians noticed that the SURGICEL® product felt different, acted differently, and handled differently than usual.  (*Id.* ¶ 4.)  That SURGICEL® product was not packaged the way it usually was, as it was not "folded up" properly in the pouch.  (*Id.*)  In addition, the technician observed that the product did not cut with scissors the way they were used to, and it kept "rolling up" after being cut into shape for use, which SURGICEL® products did not usually do.  (*Id.*)  The surgeon communicated the complaint to an Ethicon sales representative, who obtained photographs and a sample of the offending product.  (*Id.* ¶ 5.)

Ethicon received similar complaints from this University of Kentucky surgeon on May 24 and May 30, 2019, as well as additional photographs of the problematic SURGICEL® product.  (*Id.* ¶¶ 8-11.)  In these photographs, the University of Kentucky team compared the packaging of a sample of a SURGICEL® product that was the "good kind that we like" to the packaging of the complained-of product, which "we don't like because it's thicker & frails." (*Id.* ¶ 12.)



(*Id.*)

As shown in the photograph, the packaging of the product that the University of Kentucky did not like displayed lot number KGB6651 and indicated that it was manufactured in San Lorenzo, Puerto Rico. (*Id.*) SURGICEL® products with this lot number are not intended for sale in the United States. (Declaration of Roy Albiani, dated July 10, 2019 ("Albani Decl.") ¶ 2.) Rather, the entire lot was shipped in 2016 to non-US countries including Japan, Israel, India and Singapore. (*Id.*) Accordingly, this product could not have been sourced from an authorized U.S. distributor of SURGICEL® products. (*Id.*)

**Ethicon's Testing of the University of Kentucky SURGICEL® Sample**

Ethicon experts in both packaging and product departments reviewed the University of Kentucky sample and concluded that it was counterfeit.

**Packaging.**   A senior principal package engineer, Denise Dacey, compared the University of Kentucky sample, which had lot number KGB6651, with an authentic "retain" sample—that is, a sample product that Ethicon had retained from that lot for future analysis— from that same lot.   (Decl. of Denise Dacey, dated July 10, 2019 ("Dacey Decl.") ¶¶ 1, 3-5.) Based on a number of differences between the retain sample and the University of Kentucky sample, Ms. Dacey concluded that the University of Kentucky packaging was highly likely not authentic SURGICEL® packaging but rather is counterfeit.  (*Id.* ¶ 7.)

There are at least five differences between the packaging of the University of Kentucky sample and the retain sample.  (*Id.* ¶ 9.)  *First*, the University of Kentucky sample lists a date of manufacture for the pouch (September 28, 2013) that is inconsistent with Ethicon's records regarding the date on which the pouches used for lot KGB6651 were manufactured.  (*Id.*) *Second*, the blue ink on the University of Kentucky sample was smeared upon receipt and could be further smeared with light finger rubbing, which would not be expected from genuine SURGICEL® products.  (*Id.*)  *Third*, the spacing of the print on the University of Kentucky sample was different from the retain sample used as a reference.  (*Id.*)  *Fourth*, the font appeared to be different between the two samples for the "Made" in the "Made in USA" text.  (*Id.*) *Finally*, the pouch in the University of Kentucky sample was sealed in a way that indicated it was made on different equipment than the equipment used for authentic SURGICEL® products.  (*Id.*)

The following illustrates some of these differences:



(*Id.* ¶ 8.)

**Product.**  An Ethicon Principal Scientist, Daniel Burkley, compared the University of Kentucky sample to an authentic "retain" sample from that lot.  (Burkley Decl. ¶¶ 1, 6.)  The scientist concluded that the University of Kentucky sample was counterfeit.  (*Id.* ¶ 7.)

Mr. Burkley identified noticeable differences between the weave of the University of Kentucky sample and the authentic SURGICEL, which were particularly glaring when viewed under 50x magnification:



(*Id.* ¶ 10.)

Crucially, moreover, the infrared spectra for the two products are different.  (*Id.* ¶ 11.)
Infrared spectroscopy is a standard method used in science and industry to identify the
molecular structure of materials.  (*Id.* ¶ 11.)  As indicated in the figure below, the infrared
spectrum for the University of Kentucky sample (in gold) differs significantly from that of the
genuine product (in red):



(*Id.* ¶ 11.)  The peak around 1700 on the X axis in the genuine SURGICEL® is much larger, as is the smaller shoulder peak around 1630.  In addition, there are differences in the 1200 to 1400 region.  (*Id.* ¶ 12.)  These all indicate that the University of Kentucky sample is made from different material than the genuine product from lot KGB6651.  (*Id.*)  In particular, the counterfeit product is significantly less oxidized than the genuine product.  (*Id.*)

**The Counterfeit SURGICEL® Products Are Defective and Dangerous**

Ethicon's testing establishes that the suspicious SURGICEL® product identified at the University of Kentucky is not only counterfeit, but critically defective and dangerous.

The oxidation of regenerated cellulose is very important to its usefulness in surgery. (Fitz Decl. ¶ 5.)  It is the oxidization of the regenerated cellulose product that leads to the SURGICEL® product's hemostatic, antimicrobial, and absorbable properties.  (*Id.*) Regenerated cellulose fiber that is not oxidized is essentially just fabric, for example the common textile rayon.  (*Id.*)  Non-oxidized regenerated cellulose is not absorbable in the body and does not have hemostatic or antimicrobial properties.  (*Id.*)

Dan Burkley's testing establishes that the counterfeit SURGICEL® product discovered at the University of Kentucky has significantly lower levels of oxidation than genuine SURGICEL® products.  (Burkley Decl. ¶ 12).  This significantly lower oxidation state of the counterfeit would be expected to reduce the product's antimicrobial, hemostatic, and absorption profiles – possibly to the point where it might have none of those properties.  (*Id.* ¶ 14.)  In fact, the oxidation levels of the counterfeit product are substantially below the minimum levels required for genuine SURGICEL® products and would be considered a critical manufacturing defect if measured at an Ethicon factory.  (Fitz Decl. ¶ 10.)

A particular critical danger of the counterfeit product is that it appears to lack sufficient oxidation to be absorbed if left in the body after surgery.  (*Id.* ¶¶ 6-7, 11).  If a regenerated

cellulose product with insufficient level of oxidation is left in the body after surgery, it may remain in the body as a foreign object.  (*Id.* ¶ 7.)  This could result in harmful conditions such as foreign body granuloma (a granular tumor or growth caused by the presence of a foreign body), the non-absorbed foreign matter could act as a nidus for infection, or could result in surgical adhesions (the formation of internal scar tissue that connects parts of the body that are not normally connected).  (*Id.*)

Finally, as the source or manufacturing conditions of the counterfeit product are unknown, it is not known whether the counterfeit product is sterile, which could lead to significant complications as well.  (*Id.* ¶ 12.)  Ethicon cannot vouch for the safety or efficacy of the counterfeits.  (Russo Decl. ¶ 20.)   It is not acceptable for counterfeit products to be marketed and sold for the purpose of controlling bleeding during surgery when they may not work for this purpose.  (*Id* ¶ 21.)

**The University of Kentucky's Supplier: XS Supply, LLC**

After learning of the counterfeit SURGICEL product found at the University of Kentucky, Ethicon contacted individuals at the University of Kentucky for more information about the source of the counterfeit.  (Albiani Decl. ¶ 4.)  The University of Kentucky provided Ethicon an invoice indicating that it had purchased over 1,000 units of SURGICEL® Absorbable Hemostat (product number 1952) from XS Supply, LLC ("XS Supply") in Tampa, Florida.  (*Id.* & Ex. 1 thereto.)  The invoice indicated that XS Supply had sold the University of Kentucky SURGICEL® products with the same lot number as the counterfeit sample that Ethicon tested.  (*Id.*)  Individuals at the University of Kentucky informed Ethicon that they had no record of obtaining SURGICEL® products with that lot number from any source besides XS Supply.  (*Id.* ¶ 5.)

XS Supply is located at 10360 72nd Street, Unit 820, Largo, Florida.  (Declaration of Robert Jarrell, dated July 9, 2019, ¶ 2.)  An investigator hired by Ethicon recently visited this address and found multiple cars registered to individuals associated with XS Supply.  (*Id.* ¶¶ 4-8).  The investigator was informed by an individual at that location that XS Supply occupies three suites that they use as an office and a warehouse.  (*Id.* ¶ 11.)  The site appears to be a commercial building with a shipping entrance on the front side of the building, as well as shipping bay doors in the back of the building.  (*Id.* ¶ 12.)

XS Supply is just one of a collection of corporate entities under the control of individual Defendants, all of which are in the business of distributing "discount" medical supplies. (Declaration of Hannah Coleman, dated July 12, 2019 ("Coleman Decl.") ¶¶ 4-8).   The individual Defendant's prior "discount" surgical supply shops all appear to have been quickly abandoned or to coexist with XS Supply.  (*Id.*)

In connection with the filing of this action, Ethicon has notified the United States Attorney for the Middle District of Florida of their request for a Seizure Order.  (Potter Decl. ¶ 4.)

Conclusions of Law

Faced with "an 'epidemic' of commercial counterfeiting," Congress enacted the Counterfeiting Act to provide a meaningful remedy to victims of counterfeit trafficking.  *See* S. Rep. No. 98-526, 98th Cong., 2d Sess. 5 (1984), reprinted in 1984 U.S.C.C.A.N. 3627, 3631 (*citing Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 528 (2d Cir. 1983), *cert. denied*, 465 U.S. 1100 (1984)).  The Counterfeiting Act permits a court to grant an *ex parte* order of seizure in "[c]ivil actions arising out of [the] use of counterfeit marks," including "records documenting the manufacture, sale, or receipt" of the counterfeit goods. 15 U.S.C. § 1116(d)(1)(A).  *See, e.g., SATA GmbH & Co. Kg v. Wenzhou new Century Int'l, Ltd.*, Case No. CV 15-08157-BRO

(Ex), 2015 WL 6680807, at *10-11 (C.D. Cal. Oct. 19, 2015); *Dell Inc. v. BelgiumDomains, LLC*, No. Civ. 07-22674, 2007 WL 6862341 (S.D. Fla. Nov. 21, 2007).   The purpose of allowing plaintiffs to proceed *ex parte* against known counterfeiters is "[t]o provide trademark owners with an effective means of combatting this lawless behavior."   1984 U.S.C.C.A.N. at 3628.   As Congress explained in the Senate Report accompanying this bill, "[t]he reason for this provision is that many counterfeiters, once given notice that their fraudulent operations have been discovered, will immediately dispose of the counterfeit goods and make it impossible for the trademark owner ever to bring them to justice."   *Id*. at 3629.

A plaintiff must satisfy seven statutory criteria before a court can grant an *ex parte* order of seizure under Section 1116.   *See* 15 U.S.C. § 1116(d)(4)(B).   As demonstrated below and in the declarations accompanying Plaintiffs' application, Plaintiffs have met each requirement.

1.   "An order other than an ex parte seizure order is not adequate
     to achieve the purposes of section 1114 of this title"

As recognized by Congress in enacting the Counterfeiting Act, counterfeiters are more likely than not to dispose of or conceal the counterfeit goods when confronted with a trademark action.   130 Cong. Rec. H 12076, 12080 ("[M]any of those who traffic in counterfeits have become skilled at destroying or concealing counterfeit merchandise when a day in court is on the horizon.").   It is this possibility, ever-present in any counterfeiting case, that justifies immediate and *ex parte* action to obtain the evidence needed to prove a violation of the Trademark Act.

Intentionally buying or selling counterfeits is a felony. 18 U.S.C. § 2320.   And because every entity in the chain of distribution of a counterfeit good is strictly liable under the Lanham Act, anti-counterfeiting litigation typically involves discovery of a defendants' suppliers and customers.   *See* 15 U.S.C. § 1125(a); *see, e.g.*, *N. Atl. Operating Co. v. Hammad Enters.*, No.

19-60200-BLOOM/Valle, 2019 WL 1468524 (S.D. Fla. Feb. 8, 2019).   Traffickers in counterfeits goods thus have very strong incentives to conceal not only their stock counterfeit goods but also to prevent the detection of their upstream and downstream supply chain.

There is clear evidence that Defendants sold counterfeit SURGICEL® Absorbable Hemostat featuring counterfeits of Plaintiffs' valid, protectable trademark and trade dress. Defendants are "using" the SURGICEL mark, the Ethicon trademarks, and/or the SURGICEL Trade Dress by selling counterfeit SURGICEL® Absorbable Hemostat products in counterfeit packages that are nearly identical to authentic SURGICEL® Absorbable Hemostat packaging. Defendants either knew, or should have known, that their conduct was unlawful.  Through an extensive investigation, Defendants have sold products bearing counterfeit marks, as that term is defined in 15 U.S.C. § 1116(d)(1)(B).  Because Defendants' conduct can result in criminal prosecution, there is a very real risk that Defendants will destroy or conceal the evidence of their misconduct – including the purchase and sale documentation and the inventory itself – if put on notice of this action and given the ordinary amount of time to respond to a conventional discovery request.

Plaintiffs have moved quickly after being first alerted to the defective counterfeit SURGICEL®.  As of the date of this memorandum, the named Defendants are the first and only sellers of counterfeit SURGICEL® known to Plaintiffs.  But, given the quantity of counterfeits sold and the quality of the counterfeit packaging, the named Defendants are almost certainly part of a larger network of counterfeit sellers.  There is an immediate need to protect patient safety to identify the rest of the network so that distribution of the counterfeits can be brought to the end, and to identify all other customers so the counterfeits already in the hands of hospitals can be stopped from being used on patients.  As with any investigation of criminal conduct, it is important not to tip off defendants who are in possession of easily destructible

evidence that will lead to the discovery of upstream suppliers and, ultimately, the manufacturer of the illegal product.  Especially in light of the health risk posed by the defective counterfeit SURGICEL®, the consumer-protection goals of the Lanham Act can only be adequately served by an *ex parte* seizure that will ensure the preservation of evidence concerning the distribution of these counterfeit surgical devices.

        2.    <u>"The applicant has not publicized the requested seizure"</u>

Plaintiffs have not publicized the requested seizure.  (Potter Decl. ¶ 10.)  Furthermore, as set forth in this Order, all papers in support of Plaintiffs' application for *ex parte* relief are to be kept under seal by the Clerk of this Court pending the effectuation of the seizure.

        3.    "The applicant is likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection <u>with the sale, offering for sale, or distribution of goods or services"</u>

As demonstrated above, Plaintiffs have submitted evidence that Defendants are distributing, selling, and offering for sale counterfeit SURGICEL® Absorbable Hemostat. Given this evidence, Plaintiffs have met their burden of demonstrating the likelihood of success on the merits of their counterfeiting claim and need not advance any additional proof to satisfy this statutory criterion.

        4.    "An immediate and irreparable injury <u>will occur if such seizure is not ordered"</u>

The counterfeits are currently being distributed to hospitals, potentially across the country.  Each and every sale of SURGICEL® Absorbable Hemostat further erodes the good-will and reputation associated with this product.  Plaintiffs will thus continue to suffer irreparable harm – and doctors and patients will remain at risk from adulterated and ineffective product – until the Court puts a stop to the continued sale and distribution of these counterfeits. Seizing the product and the paper trail currently in Defendants' possession is a necessary first

step, both to prevent these defendants from continuing to sell it and to identify others who may be involved.   Until that happens, Plaintiffs are being, and will continue to be, irreparably harmed.

> 5.   "The matter to be seized will be located
>       at the place identified in the application"

The following address was identified by investigators working at the direction of counsel for Plaintiffs as currently used by Defendants XS Supply, Jon M. Bird, Tyler Berger, Ivan Rodimushkin, David W. Longdue III, and Brendan Thomas: 10360 72nd Street, Largo, Florida 33777.  (Jarrell Decl. ¶¶ 2-13.)

> 6.    "The harm to the applicant of denying the application outweighs the
>       harm to the legitimate interests of the person against whom seizure
>       would be ordered of granting the application"

Defendants have no legitimate interest in selling, offering for sale, or otherwise distributing counterfeit SURGICEL® Absorbable Hemostat, and therefore cannot suffer any harm.  Plaintiffs, on the other hand, have a very strong interest in protecting the public's health and safety and their marks from the adulterated counterfeits that Defendants are selling.

As a general matter, the Trademark Counterfeiting Act does not require any showing that the counterfeits put the public's health or safety at risk: *ex parte* seizures are available against sellers of counterfeit handbags as well as sellers of counterfeit medical devices.  *See* 15 U.S.C. § 1116(d).  *Ex parte* seizure relief is especially apparent where the public is put at risk, however.   Here, the safety of patients is unquestionably of paramount importance.   The distribution of defective counterfeit surgical devices is vile: it puts patients' lives at risk for no purpose other than to make an illicit profit.  The balance of the equities here is overwhelmingly in favor of protecting the public by preventing the destruction of evidence that will help trace and remove the counterfeit products from the market as a whole.

7.     "The person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person"

Inevitably, counterfeiting victims such as Ethicon will have limited information about the sellers of counterfeits.  It is, furthermore, impossible to predict with certainty whether any counterfeiting defendant would in fact conceal or destroy evidence if given notice of an anti-counterfeiting lawsuit.  The Trademark Counterfeiting Act nevertheless provides for *ex parte* seizure orders where, as here, the available evidence indicates that proceedings on notice are "unlikely to result in preservation of the evidence and the removal of the counterfeit merchandise from commerce."  *Louis Vuitton v. White*, 945 F. 2d 569, 575 (3d Cir. 1991).

By selling counterfeit SURGICEL® Absorbable Hemostat, Defendants may have knowingly and intentionally engaged in a criminal act.  *See* 18 U.S.C. § 2320.  Given the specter of criminal prosecution, there is a real risk that Defendants will destroy records and inventory to cover up their unlawful conduct.  As Congress noted, "many of those who traffic in counterfeits have become skilled at destroying or concealing counterfeit merchandise when a day in court is on the horizon."  130 Cong. Rec. H12076, at 12080.  It is for this reason (among others) that Congress created heightened tools and remedies to combat counterfeiting, including the remedy of an *ex parte* seizure.

***First***, XS Supply misrepresented the identity of the counterfeit products to its customer, the University of Kentucky.  (Second Declaration of Roy Albiani ("Second Albiani Decl."), dated July 11, 2019, ¶¶ 4-7.)    The University of Kentucky ordered the U.S. product, SURGICEL® Original, and the Defendants sent them an invoice for "SURGICEL ORIGINAL." (Albiani Decl., Ex. 1.)  But the counterfeit products that the University of Kentucky shipped were copied from overseas products and were not labeled as "SURGICEL ORIGINAL." (Second Albiani Decl. ¶¶ 4-5.) This evidence demonstrates that Defendants provide inaccurate

information when it is in their interest to do so.  And Defendants' interest in avoiding Ethicon's claims here is far greater than their interest in avoiding detection by the University of Kentucky.

**Second**, the foreign packaging of the counterfeits at issue here indicates that they cannot have been obtained from anything resembling a legitimate U.S. source.  (*Id.* ¶ 8.)  Ethicon's Asian SURGICEL® packaging was almost certainly copied in Asia or the Middle East.  (*Id.*)  Legitimate U.S. SURGICEL® products cannot be obtained from these locations.  (*Id.*)  Defendants knew or should have known that the counterfeits they sold came from illegitimate sources.  They therefore have all the more incentive to cover their tracks.

**Third**, XS Supply is just one of a collection of shadowy corporate entities under the control of individual Defendants, all of which are in the business of distributing "discount" medical supplies.  (Coleman Decl. ¶¶ 4-8).  The individual Defendant's prior "discount" surgical supply shops all appear to have been quickly abandoned or to coexist with XS Supply.  (*Id.*)  The serial opening and closing of small businesses, all of the same type and all operating in the gray market, is evidence that Defendants run the sort of "fly by night" operation the Trademark Counterfeiting Act is intended to combat.  *Louis Vuitton*, 945 F. 2d at 575 (noting that Congress considered "ex parte seizures ... a necessary tool to thwart the bad faith efforts of fly by night defendants") (quoting Joint Statement, 130 Cong. Rec. at H120781).

**Fourth**, experience with gray-goods medical suppliers such as Defendants– including in two very recent cases – confirms that they often conceal or manipulate evidence when given notice of suit and are allowed to produce documents and information themselves in the course of normal discovery.  (Second Declaration of Geoffrey Potter, dated July 12, 2019 ¶¶ 7-8 & Exs. 1-2.)  Given the limited information that victims inevitably have about those who sell counterfeits, the fact that Defendants are members of an industry infamous for concealing

information supports Ethicon's application. *See Louis Vuitton*, 945 F. 2d at 570, 576 (holding that seizure order brought against "several street vendors" should have been granted).

**Finally**, the counterfeits goods at issue in this action are high-value, but small, lightweight, and easily concealable, and therefore exceedingly easy to move or hide on short notice, and Defendants' records are computer-generated and thus easy to modify or irretrievably delete.

In sum, the evidence available about Defendants shows that they are unacceptably likely to conceal evidence that is necessary to remove dangerous SURGICEL® counterfeit products from the market.

DONE AND ORDERED in Tampa, Florida this 15th day of July, 2019.

ANTHONY E. PORCELLI
United States Magistrate Judge

cc:     Plaintiffs
        U.S. Marshal's Office