UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHNSON & JOHNSON, ETHICON, INC., and : 
ETHICON US, LLC, :
                                     :     Case No. 8:19-cv-1673-T-33AEP
                   Plaintiffs,    :
                                       :
v.                                     :     **JURY TRIAL DEMANDED**
                                       :
XS SUPPLY, LLC, JON M. BIRD, TYLER   :     **FILED *EX PARTE* AND UNDER SEAL**
BERGER, IVAN RODIMUSHKIN, DAVID W.   :     **PURSUANT TO 15 U.S.C. § 1116 AND**
LONGDUE III, BRENDAN THOMAS, LION   :     **THE COURT'S ORDER (DKT. NO. 97)**
HEART SURGICAL SUPPLY LLC, LION     :
HEART SURGICAL SUPPLY CORP., FABIAN   :
CONDE, JANAINA D. NASCIMENTO, PURE   :
CARE TRADERS F.Z.E., ALI HUSSAIN, VERY : 
NICE DEALS, INC. d/b/a AK GLOBAL MED,   :
ASHRAF ABUKHALAF, M/S MEDSERVE, and : 
PRITAMDAS ARORA,                       :
                                       :
                   Defendants.     :
-------------------------------------------------------------

## SECOND AMENDED COMPLAINT

Plaintiffs Johnson & Johnson, Ethicon, Inc., and Ethicon US, LLC (together, "Ethicon" or "Plaintiffs"), by and through their attorneys, Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A. and Patterson Belknap Webb & Tyler LLP, for their second amended complaint against Defendants XS Supply, LLC, Jon M. Bird, Tyler Berger, Ivan Rodimushkin, David W. Longdue III, and Brendan Thomas (collectively, "XS Supply"); Lion Heart Surgical Supply LLC, Lion Heart Surgical Supply Corp., Fabian Conde, and Janaina D. Nascimento (collectively, "Lion Heart"); Pure Care Traders F.Z.E. and Ali Hussain (together, "Pure Care"); Very Nice Deals, Inc. d/b/a AK

Global Med  and Ashraf Abukhalaf (together, "AK Global"); and M/S Medserve and

Pritamdas Arora (together "Medserve"), allege as follows:

## THE NATURE OF THE ACTION

1.      This is an anti-counterfeiting action against counterfeiters of

Ethicon's SURGICEL® Absorbable Hemostat, a textile used to stop or reduce bleeding in

surgical procedures.  While  the counterfeiters have carefully and faithfully reproduced

the authentic packaging, along with accurate depictions of Ethicon's trademark, the

product contained within is dramatically different.  SURGICEL® products are designed to

remain inside the body after surgery, where it is harmlessly absorbed.   Not only do the

counterfeits not work, but they are non-sterile and bacterially contaminated.  Use of the

counterfeits during surgery could cause serious injury or death.

2.      Ethicon discovered these dangerous and defective counterfeit

surgical products in, among other places, a neurosurgery operating room at the University

of Kentucky Medical Center.  These non-authentic products are sold to hospitals and

clinics through gray-market (or so-called "secondary") distributors.  These gray-market

distributors claim to be selling authentic diverted product at a discount, but in reality

deliver cheaply made counterfeits.

3.      Whether because they are intentionally selling non-authentic

product or because they are willfully blind to the obvious risk that they are trafficking in

counterfeits, these gray-market distributors turn an illicit profit by putting patients' lives

at risk.  Clinics and hospitals who purchase surgical products like SURGICEL® from

gray-market distributors cannot verify the origin or authenticity of the products they

receive and use on patients.  Ethican can vouch for the authenticity only of the products

sold through Ethicon's authorized distributors.

4.      To eradicate these dangerous counterfeit surgical products from the

market, Ethican now brings this anti-counterfeiting action for injunctive and monetary

relief for trademark infringement in violation of Section 32 of the Lanham Act (15 U.S.C.

§ 1114); false descriptions and false designations of origin in commerce in violation of

Section 43 of the Lanham Act (15 U.S.C. § 1125) and 501.201 of the Florida Statutes;

trademark dilution in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125) and

Section 495.151 of the Florida Statutes; and common-law unjust enrichment and unfair

competition.

## THE PARTIES

5.      Plaintiff Johnson & Johnson is a New Jersey corporation, with its

principal place of business at One Johnson & Johnson Plaza, New Brunswick, New

Jersey.  Johnson & Johnson is the owner of the SURGICEL® trademark, the FIBRILLAR

trademark, and the Ethicon trademarks described below.

6.      Plaintiff Ethicon, Inc., is a New Jersey corporation, with its

principal place of business at Route 22 West, Somerville, New Jersey.  Ethicon, Inc., is a

wholly-owned subsidiary of Johnson & Johnson and manufactures SURGICEL®

products.  Ethicon, Inc., is the owner of the SURGICEL® Trade Dress described below.

7.      Plaintiff Ethicon US, LLC, is a Texas limited liability company,

with its principal place of business at 4545 Creek Road, Cincinnati, Ohio 45242.  Ethicon

US, LLC is an indirect subsidiary of Ethicon, Inc. and Johnson & Johnson and distributes

and sells SURGICEL® products in the United States.

8.      Plaintiffs are collectively referred to herein as "Ethicon."

9.      Defendant XS Supply, LLC is a Florida limited liability company with its principal place of business at 10360 72nd Street, Unit 820, Largo, Florida 33777.

10.     Defendant Jon Michael Bird owns 45% of XS Supply's capital stock and is the chief executive and chief strategy officer of XS Supply, LLC and in that capacity, operates and controls Defendant XS Supply, LLC.

11.     Defendant Ivan Alexandrovich Rodimushkin owns 45% of XS Supply, LLC's capital stock and is chairman of the board at XS Supply and, along with Bird, is its chief executive officer, and in that capacity, operates and controls Defendant XS Supply, LLC.

12.     Defendant Tyler Berger owns 10% of XS Supply, LLC's capital stock and is XS Supply, LLC's chief operating officer, and in that capacity, operates and controls Defendant XS Supply, LLC.

13.      Defendant David W. Longdue III is XS Supply's director of finance, and in that capacity, operates and controls Defendant XS Supply.  Longdue has personally sold counterfeit SURGICEL® products on behalf of XS Supply, LLC.

14.     Defendant Brendan Thomas is XS Supply, LLC's senior account manager, and in that capacity, operates and controls Defendant XS Supply, LLC. Thomas has personally sold counterfeit SURGICEL® products on behalf of XS Supply, LLC.

15.     Defendant Lion Heart Surgical Supply LLC is a Florida limited

- 4 -

liability company with its principal place of business at 2130 Van Buren Street, #206,
Hollywood, Florida 33020.  According to business records, Lion Heart Surgical Supply
LLC is the entity that sold the counterfeit SURGICEL® product to XS Supply.  However,
Lion Heart Surgical Supply LLC is listed as "inactive" in the Florida Division of
Corporations, having been converted into Lion Heart Surgical Supply Corp.

      16.    Defendant Lion Heart Surgical Supply Corp. is a Florida limited
liability company with its principal place of business at 2130 Van Buren Street, #206,
Hollywood, Florida 33020.  Lion Heart Surgical Supply Corp. was registered with the
Florida Division of Corporations in July 2018 as a successor to Lion Heart Surgical
Supply LLC.

      17.    Defendant Fabian Conde is a manager of Lion Heart Surgical
Supply LLC and the director and member of Lion Heart Surgical Supply Corp., and in
that capacity, operates and controls Defendants Lion Heart Surgical Supply LLC and
Lion Heart Surgical Supply Corp.  Conde has personally sold counterfeit SURGICEL®
products on behalf of Lion Heart Surgical Supply LLC.

      18.    Defendant Janaina D. Nascimento is a manager of Lion Heart
Surgical Supply LLC and a member of Lion Heart Surgical Supply Corp., and in that
capacity, operates and controls Defendants Lion Heart Surgical Supply LLC and Lion
Heart Surgical Supply Corp.  Nascimento has personally sold counterfeit SURGICEL®
products on behalf of Lion Heart Surgical Supply LLC.

      19.    Defendant Pure Care Traders F.Z.E. is company that operates in
the Free Trade Zone in the United Arab Emirates, with its principal place of business in

Ajman, United Arab Emirates.  Defendant Pure Care Traders F.Z.E. also does business under the name "Pure Care Medical & Scientific Supplies."

20.     Defendant Ali Hussain is the Managing Director of Defendant Pure Care Traders F.Z.E., and in that capacity, operates and controls Defendant Pure Care Traders F.Z.E.  Hussain has personally sold counterfeit SURGICEL® products on behalf of Pure Care Traders F.Z.E.

21.     Defendant Very Nice Deals, Inc. d/b/a AK Global Med is a corporation with its principal place of business at 2635 Leyland Lane, Aurora, Illinois.

22.      Defendant Ashraf Abukhalaf is the President and Sales Director of Defendant Very Nice Deals, Inc. d/b/a AK Global Med, and in that capacity operates and controls Defendant Very Nice Deals, Inc. d/b/a AK Global Med.  Abukhalaf has personally sold counterfeit SURGICEL® products on behalf of Defendant Very Nice Deals, Inc. d/b/a AK Global Med.

23.     Defendant M/S Medserve is a company with its principal place of business in Delhi, India.

24.     Defendant Pritamdas Arora is an owner, founder, and/or principal of Defendant M/S Medserve and in that capacity operates and controls Defendant M/S Medserve.  Arora has personally sold counterfeit SURGICEL® products on behalf of Defendant M/S Medserve.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 1121(a), 1331, 1338, and 1367 and general principles of ancillary and

pendent jurisdiction.

26.     The Court has personal jurisdiction over each of the Defendants because each of the Defendants has sufficient minimum contacts with Florida and with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

27.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) because XS Supply's offices are located in this District, because Lion Heart sold and shipped counterfeit SURGICEL® products directly to XS Supply in this District, because AK Global and Medserve sold and shipped counterfeit SURGICEL® products directly to an entity in this District, and because a substantial part of the events giving rise to Ethicon's claims occurred in this District.

## FACTUAL ALLEGATIONS

### Ethicon's SURGICEL® Absorbable Hemostat Products

28.     Ethicon has been selling SURGICEL® products for over 60 years. SURGICEL® products are hemostats, or surgical products used to control bleeding.  The SURGICEL® family of products includes what is now branded as the SURGICEL® Original Absorbable Hemostat, SURGICEL® FIBRILLAR™, as well as other products.

29.     SURGICEL® products are made out of oxidized regenerated cellulose, a material that has several qualities that are useful for surgery.  First, SURGICEL® is useful in controlling bleeding during surgery.  Second, SURGICEL® is absorbable in the body, so it can be left inside of the patient after surgery.  Third, SURGICEL® acts as an antimicrobial agent.  Each of these three features—the

hemostatic properties, the absorbable properties, and the antimicrobial properties—are important in surgeries.

30.     Notably, all of these properties are attributable to the oxidized state of the regenerated cellulose material used to make SURGICEL® products.  Regenerated cellulose fiber that is not oxidized does not have hemostatic or antimicrobial properties and it is not absorbable in the body.

31.     When it launched in 1957, SURGICEL® was the first oxidized regenerated cellulose hemostat available on the market, setting a new standard of care for controlling bleeding in certain procedures.  The SURGICEL® brand is the #1 trusted brand of adjunctive hemostats, and is widely trusted by surgeons for its consistent safety and performance.  SURGICEL® products are used in millions of procedures a year, and have been used more than 150 million times worldwide.

32.     All authentic SURGICEL® Absorbable Hemostat distributed in the United States is manufactured, according to a specific and consistent formula, at a factory located in Neuchatel, Switzerland.  This state-of-the-art facility has rigorous quality control, specialized equipment, and consistent processes to produce a product that surgeons can rely on to be the same material in each package.  Ethicon also uses a factory located in San Lorenzo, Puerto Rico, which manufactures a number of SURGICEL® products, including SURGICEL® Absorbable Hemostat for distribution in certain regions outside of the United States.  In addition to direct sales, Ethicon distributes SURGICEL® in the United States through a specific set of authorized distributors, who then sell the product to healthcare facilities such as hospitals for use in surgical procedures.  Through

these controls and others, Ethicon seeks to safeguard the reputation for safety, reliability,

and quality that SURGICEL® products have developed over 60 years.

**Trademarks Used on SURGICEL® Products**

33. Johnson & Johnson is the owner of a number of the following

well-established famous and registered trademarks that appear on the packaging of

genuine SURGICEL® products (collectively, the "SURGICEL Marks"):

- Ethicon's "Surgicel" trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on August 4, 1959, as U.S. Registration No. 682773.

- Ethicon's "Ethicon" trade trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on June 3, 1958, as U.S. Registration No. 662658.

- Ethicon's **ETHICON** trademark, which was registered on the Principal Register of the United States Patent and Trademark Office on December 14, 1954, as U.S. Registration No. 599432.

34. Ethicon uses distinctive packaging (the "SURGICEL Trade

Dress") to distinguish its SURGICEL® products in the marketplace. Ethicon is the owner

of the SURGICEL Trade Dress, which includes the exterior and interior packaging of

SURGICEL® products, including but not limited to the packaging illustrated below:



35.     Ethicon has used and is currently using these trademarks and trade dress in commerce and in connection with its sale of SURGICEL® products and plans to continue such use in the future.  Ethicon prominently displays them in its advertising and promotional materials.

36.     Ethicon has engaged and continues to engage in activities designed to promote SURGICEL® products and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States.  The SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress symbolize business goodwill of Ethicon and are invaluable assets to Ethicon.

**Discovery of Counterfeit SURGICEL® at the University of Kentucky**

37.     In May 2019, Ethicon received a number of complaints of defective SURGICEL® Absorbable Hemostat at the University of Kentucky Medical Center.  A sample of those products has been tested and Ethicon has established that it is counterfeit.

38.     On May 10, 2019, a neurosurgeon at the University of Kentucky Medical Center noticed a problem with a SURGICEL® Absorbable Hemostat while performing brain surgery.  The surgeon and his technicians noticed that a SURGICEL® product felt, acted, and handled differently than usual.  That SURGICEL® product was not packaged the way it usually was, and it was not "folded up" properly in the pouch.  In addition, the technician observed that the product did not cut with scissors the way that the team was used to, and it kept "rolling up" after being cut into shape for use, which

SURGICEL® products did not usually do.  The surgeon transmitted the complaint to an Ethicon sales representative, who obtained photographs and a sample of the offending product.

        39.     Ethicon received similar complaints from this University of Kentucky surgeon on May 24 and May 30, 2019, as well as additional photographs of the problematic SURGICEL® product.  In these photographs, the University of Kentucky team compared the packaging of a sample of a SURGICEL® product that was the "good kind that we like" to the packaging of the complained-of product, which "we don't like because it's thicker & frails."




40. As shown in the photograph, the packaging of the product that the University of Kentucky surgeon did not like displayed lot number KGB6651 and indicated that it was manufactured in San Lorenzo, Puerto Rico. SURGICEL® products with this lot number are not intended for sale in the United States. Rather, the entire lot was shipped in 2016 to non-US countries. Accordingly, this product could not have been sourced from an authorized U.S. distributor of SURGICEL® products.

**Ethicon's Testing of the University of Kentucky SURGICEL® Sample**

41. Ethicon experts in both packaging and product departments reviewed the University of Kentucky sample and concluded that it was counterfeit.

42. A package engineer at Ethicon compared the package from the University of Kentucky sample, which had lot number KGB6651, with an authentic "retain" sample—that is, a sample product that Ethicon had retained from that lot for future analysis—from that same lot. Based on a number of differences between the retain sample and the University of Kentucky sample, the package engineer concluded that the University of Kentucky packaging was highly likely not authentic SURGICEL® packaging but rather is counterfeit.

43. There are at least four differences between the packaging of the University of Kentucky sample and the retain sample. *First*, the University of Kentucky sample lists a date of manufacture for the pouch (September 28, 2013) that is inconsistent with Ethicon's records regarding the date on which the pouches used for lot KGB6651 were manufactured. *Second*, the blue ink on the University of Kentucky sample was smeared upon receipt and could be further smeared with light finger rubbing, which

would not be expected from genuine SURGICEL® products.  *Third*, the spacing of the print on the University of Kentucky sample was different from the retain sample used as a reference.  *Fourth*, the font appeared to be different between the two samples for the "Made" in the "Made in USA" text.

44.     The following illustrates some of these differences:



45.     An Ethicon scientist compared the product from the University of Kentucky sample with an authentic "retain" sample from that lot.  The scientist concluded that the University of Kentucky sample was counterfeit.

46.     The scientist identified noticeable differences between the weave of the University of Kentucky sample and the authentic SURGICEL®, which were particularly glaring when viewed under 50x magnification:



**SURGICEL 1952**
Lot KGB6651
(Retain from San Angelo)

Side 'A'     Side 'B'

**SURGICEL 1952**
Lot KGB6651
(PC-000459658 counterfeit)

Side 'A'     Side 'B'

47.     Furthermore, the infrared spectra for the two products are different. Infrared spectroscopy is a standard method used in science and industry to identify the molecular structure of materials.  As indicated in the figure below, the infrared spectrum for the University of Kentucky sample (in gold) differs significantly from that of the genuine product (in red):



The peak around 1700 on the X axis in the genuine SURGICEL® is much larger, as is the smaller shoulder peak around 1630.  In addition, there are differences in the 1200 to 1400 region.  These all indicate that the University of Kentucky sample is made from different material than the genuine product from lot KGB6651.  In particular, the counterfeit product is significantly less oxidized than the genuine product.

**The Counterfeit SURGICEL® Products Are Defective and Dangerous**

48.     Ethicon's testing establishes that the suspicious SURGICEL® products identified at the University of Kentucky are not only counterfeit, but critically defective and dangerous.

49.     The oxidation of regenerated cellulose is very important to its usefulness in surgery.  It is the oxidization of the regenerated cellulose product that leads to the SURGICEL® product's hemostatic, antimicrobial, and absorbable properties.  Regenerated cellulose fiber that is not oxidized is essentially just fabric, for example the common textile rayon.  Non-oxidized regenerated cellulose is not absorbable in the body and does not have hemostatic or antimicrobial properties.

50.     Ethicon's testing establishes that the counterfeit SURGICEL® product discovered at the University of Kentucky has significantly lower levels of oxidation than genuine SURGICEL® products.  This significantly lower oxidation state of the counterfeit would be expected to reduce the product's antimicrobial, hemostatic, and absorption profiles – possibly to the point where it might have none of those properties.  In fact, the oxidation levels of the counterfeit product are substantially below the minimum levels required for genuine SURGICEL® products and would be considered

a critical manufacturing defect if measured at an Ethicon factory.

51.     A particular critical danger of the counterfeit product is that it appears to lack sufficient oxidation to be absorbed if left in the body after surgery.  If left in the body after surgery, it may remain in the body as a foreign object.  This could result in harmful conditions such as foreign body granuloma (a granular tumor or growth caused by the presence of a foreign body), the non-absorbed foreign matter could act as a nidus for infection, or could result in surgical adhesions (the formation of internal scar tissue that connects parts of the body that are not normally connected).

52.     Moreover, an outside laboratory has confirmed that samples of the counterfeit SURGICEL® products are **not** sterile, which creates a serious risk of infection for surgical patients. The source and manufacturing and packaging conditions of counterfeit products are unknown.  Ethicon cannot vouch for the safety or efficacy of the counterfeits.

**XS Supply, LLC Supplied the Counterfeits to the University of Kentucky**

53.     After learning of the counterfeit SURGICEL® products found at the University of Kentucky, Ethicon contacted the University of Kentucky for more information about the source of the counterfeits.  The University of Kentucky provided Ethicon an invoice indicating that instead of buying the product from an authorized distributor, the University purchased over 1,000 units of SURGICEL® Absorbable Hemostat (product number 1952) for a low price from a gray market diverter by the name of  XS Supply with a P.O. Box in Tampa, Florida.  Defendant Longdue emailed the invoice to the University of Kentucky on behalf of XS Supply, and copied Defendants

Bird, Berger, and Thomas on his email.

54.     The invoice indicated that XS Supply had sold the University of
Kentucky SURGICEL® products with the same lot number as the counterfeit sample that
Ethicon obtained from the University of Kentucky and tested.  Individuals at the
University of Kentucky informed Ethicon that they had no record of obtaining
SURGICEL® products with that lot number from any source besides XS Supply.

55.     XS Supply's invoice also misrepresented the product they
purported to be shipping to the University of Kentucky.  XS Supply's invoice falsely
stated that XS Supply was providing "SURGICEL Original" hemostat, but the face of the
counterfeit product that XS Supply provided stated the product was SURGICEL®, not
SURGICEL® Original.

56.     The SURGICEL® product that XS Supply shipped to the
University of Kentucky is not distributed in the United States.  In fact, the carton
prominently states that it is not intended for re-export into the United States.

**Lion Heart Supplied Counterfeits to XS Supply**

57.     On July 15, 2019, this Court entered a seizure order against XS
Supply.

58.     On July 17, 2019, Ethicon executed that seizure order at XS
Supply's corporate offices and warehouse.  As part of that seizure, Ethicon obtained from
XS Supply  records and information  that indicated that XS Supply had bought the
counterfeit SURGICEL® products from Lion Heart Surgical Supply LLC.  XS Supply's
records list Lion Heart Surgical Supply LLC as the seller; according to Florida Division

of Corporation's records, Lion Heart Surgical Supply LLC was converted to Lion Heart Surgical Supply Corp. in July 2018.

59.     The most recent annual report filed by Lion Heart Surgical Supply LLC, dated February 26 2018, lists Defendant Conde as the "Manager" and Defendant Nascimento as the "MGR" of Lion Heart Surgical Supply LLC.

60.     In the July 2018 record with the Florida Division of Corporations, Defendant Conde is listed as the Director of Lion Heart Surgical Supply Corp. as well as one of its Members, and Defendant Nascimento is listed as the other Member.

61.     On July 18, 2019, this Court entered a seizure order against Lion Heart.

62.     On July 22, 2019, Ethicon executed that seizure order at Lion Heart's corporate offices and warehouse.  At that seizure, Ethicon collected multiple units of SURGICEL® products from Lion Heart.  Ethicon performed substantially identical testing on the seized Lion Heart products and packaging that it had performed on the sample obtained from the University of Kentucky.  The tests resulted in substantially similar results confirming that 120 units of SURGICEL® hemostats and their packaging seized from Lion Heart were counterfeit.

**Lion Heart Purchased and Sold the Counterfeits Despite Being Repeatedly Warned that They Were Unlawful**

63.     Documents collected from Lion Heart during the seizure show that before it sold the counterfeit SURGICEL® products to XS Supply, Lion Heart first sold the product to a different customer.  After receiving the counterfeit SURGICEL®, Lion Heart's original customer rejected the order and informed Lion Heart that he would not

do business with them again.  Lion Heart's customer repeatedly stated that the product was unlawful and would result in legal troubles, and repeatedly asked Lion Heart to disclose its supplier, which Lion Heart refused to do.

64.     Lion Heart attempted to assuage its original customer's concerns by instructing him to "open the boxes" and "sell by unit" without the outer packaging. The customer refused and continued to state that the product was unlawful.

65.     Lion Heart's customer stated that he was "instruct[ing] my attorneys to contact the FDA and inform them of this matter."  Lion Heart stated in response: "I will not going back and forward with this anymore, both of us are doing which we assume as right for our own business and as you know these products have depreciation."

66.     Lion Heart's original customer subsequently did return the counterfeit SURGICEL® to Lion Heart, and retained a sample of the counterfeit product out of caution and to protect himself.

67.     After its original customer returned the counterfeits, and despite the original customer's repeated warnings that the product was unlawful, on April 26, 2019, Lion Heart re-sold the counterfeits to XS Supply without disclosing any of the concerns raised by its original customer.  Those counterfeits were then sold by XS Supply to the University of Kentucky, potentially putting patients at risk.

68.     A week after re-selling the counterfeits to XS Supply, Lion Heart purchased additional counterfeit SURGICEL® products from its overseas supplier, ordering an additional 120 SURGICEL® hemostat units on or about May 1, 2019.

Ethicon seized those counterfeit products during the seizure before Lion Heart was able to sell them.

**Lion Heart Purchased the Counterfeits from Pure Care**

69.     Documents obtained from Lion Heart during the seizure confirm that Lion Heart purchased the counterfeit SURGICEL® products from Pure Care, who shipped the products from overseas to Lion Heart in Florida.  Pure Care is an overseas supplier whom Lion Heart had never met, with whom it had never previously done business, and about whom it knew next to nothing.

70.     On or about May 6, 2018, Lion Heart was contacted via WhatsApp by a man identifying himself as a medical device supplier located in Pakistan.  That supplier was unknown to Lion Heart, and  Lion Heart did not perform any due diligence on the supplier.  That supplier stated they could not provide SURGICEL® products to Lion Heart, but referred Lion Heart to Pure Care and Ali Hussain in the United Arab Emirates as a potential supplier.  Lion Heart had no previous knowledge of Pure Care and did not perform due diligence on this referral they received from an overseas stranger on the Internet.

71.     On or about January 5, 2019, Lion Heart purchased 70 boxes of SURGICEL® Absorbable Hemostat, product code 1952, lot number KGB6651.

Pure Care Purchased the Counterfeits from Medserve

72.     Documents and communications obtained from Lion Heart during the seizure show that Pure Care informed Lion Heart that Pure Care had purchased the counterfeit SURGICEL® products from Medserve in India.

- 20 -

AK Global and Medserve Sell Additional Counterfeits to Ethicon's Investigators

73.     Through third-party discovery, Ethicon learned that one of Pure Care's other customers was AK Global, located in Illinois.  Ethicon, through its counsel and their investigators, made a test purchase of several SURGICEL® products from AK Global.  AK Global negotiated, confirmed, and invoiced the order, but the products were shipped directly by Medserve from India to Ethicon's investigators located in the Middle District of Florida.

74.     Ethicon tested samples of the SURGICEL® products sold to its investigators by AK Global and Medserve.  The testing confirmed that multiple lots of SURGICEL®, including both the packaging the product itself, were counterfeit.  The counterfeits that were purchased from AK Global and Medserve share many similarities with the sample received from the University of Kentucky, but also have some differences.

75.     A package engineer at Ethicon compared the packages of samples of the SURGICEL® purchased from AK Global and Medserve, which had lot numbers MBB2262 and MLE1231, and compared them to retain samples as well as supplier-approved print plates.  There are several differences between the packaging of the University of Kentucky sample and the retain sample.  *First*, the text "easy peel" is italicized on the AK Global / Medserve packaging but not in genuine samples.  *Second*, the barcode is placed at a different location between the AK Global / Medserve packaging and genuine samples.  *Third*, some of the packages for the AK Global / Medserve packaging were the wrong size.  *Fourth*, multiple pouches from the AK Global

/ Medserve packaging were stamped with the exact same manufacturing stamp, which is not possible on authentically manufactured product. *Fifth*, the notches on the packages from the AK Global / Medserve packaging were misaligned. *Sixth*, at least one sample from AK Global / Medserve had a misaligned bottom seal, likely affecting the sterility of the product. Some of those differences are illustrated below.



SURGICEL 2x3 1953
Lot MBB2262

76.     There are also differences between the authentic outer carton for SURGICEL® and the product purchased from AK Global / Medserve, including different shading on text and the omission of "not for re-export" text on the carton. The outer carton of the AK Global / Medserve SURGICEL® was also constructed differently than the authentic carton.

- 22 -

77.     An Ethicon scientist also identified noticeable differences between the weave of the AK Global / Medserve SURGICEL® samples and the authentic SURGICEL®, which (as with the samples obtained from the University of Kentucky) were particularly glaring when viewed under 50x magnification:



78.     Furthermore, the infrared spectra for the authentic product and the AK Global / Medserve products are different.  As indicated in the figure below, the infrared spectrum for the AK Global / Medserve products (in red) differs significantly from that of the genuine product (in blue):



As with the University of Kentucky sample, the testing confirms sample is made from different material than the genuine product from lot KGB6651.  In particular, the counterfeit product is significantly less oxidized than the genuine product.

79.    As with the counterfeit retrieved from the University of Kentucky and Lion Heart, the counterfeit SURGICEL® from AK Global / Medserve has significantly lower levels of oxidation than genuine SURGICEL® products, which would be considered a critical manufacturing defect if measured at an Ethicon factory.

**AK Global and Medserve Also Sell Additional Counterfeit-Packaged Products**

80.    In addition to the counterfeit SURGICEL® described above—where both the packaging and the product were counterfeit—AK Global and Medserve also shipped Ethicon's investigators what appears to be authentic product in counterfeit packaging.  The seemingly authentic product in counterfeit packaging is SURGICEL®

FIBRILLAR™, which is a different product from the SURGICEL® counterfeit products.

81.     An Ethicon packaging engineer and an Ethicon scientist examined samples of the SURGICEL® FIBRILLAR™ purchased from AK Global / Medserve and noted differences on the packaging as compared to authentic product.  *First,* there were differences in spacing on the text of the package.  *Second*, the barcode was positioned differently on the packages from AK Global / Medserve as compared to authentic product.  *Third*, some packages from AK Global / Medserve had oily spots on the outside.  *Fourth*, the pouch notches on the packages from AK Global / Medserve were misaligned.  *Fifth*, some packages from AK Global / Medserve were too wide.  *Sixth*, multiple pouches of SURGICEL® FIBRILLAR™ purchased from AK Global / Medserve were stamped with the exact same manufacturing stamp, which is not possible on authentically manufactured product.  *Seventh*, the heat-seal material used in the pouch packaging did not match the package heat-seal material of authentic product when examined by infrared spectroscopy.  Some of those differences are illustrated below.





82. Testing also revealed that the outer cartons of the SURGICEL®

FIBRILLAR™ purchased from AK Global / Medserve differed materially from authentic

product and were counterfeit. For example, the box art that appears on authentic product

was completely missing from the sides of the cartons provided by AK Global / Medserve,

which were blank. Moreover, the sticker listing the expiration date and lot number

appears under the shrink warp in authentic product, but was placed on top of the shrink

wrap on the product received from AK Global / Medserve.

83. The counterfeit packaging for the SURGICEL® FIBRILLAR™ sold by AK Global / Medserve contains counterfeit lot numbers and expiration dates. Although Ethicon cannot know for sure, one possible reason authentic product would be re-packaged into counterfeit packaging would be to sell expired product with a new, false expiration date. The sale of expired product poses a risk to patient safety. Moreover, the act of repackaging sterile medical devices like SURGICEL® FIBRILLAR™, which is done in unknown conditions, creates a serious risk that the product is contaminated and no longer sterile. Ethicon cannot vouch for the safety or efficacy of the product that has been repackaged into counterfeit packaging.

**Medserve Is a Recidivist Counterfeiter of Surgical Devices**

84. Medserve has previously been caught selling counterfeit implanted surgical devices into the United States.

85. In December 2011, a medical device distributor named RAM Medical, Inc. pled guilty to selling hundreds of boxes of counterfeit surgical mesh, which it had purchased from a company in the Free Trade Zone in the United Arab Emirates, which in turn had purchased the counterfeit surgical mesh Medserve in India. RAM Medical, Inc. also purchased additional counterfeit mesh directly from Medserve.

86. Here, Lion Heart purchased the counterfeit SURGICEL® from a different company in the Free Trade Zone in the United Arab Emirates (Pure Care), which had purchased the counterfeit SURGICEL® from Medserve in India.

**FIRST CLAIM FOR RELIEF**
**FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114(1)(a))**

87.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 86 of this Second Amended Complaint as if fully set forth herein.

88.    In violation of 15 U.S.C. § 1114(1)(a), Defendants, independently and in conspiracy with one another, used in commerce, without Plaintiffs' consent, either a reproduction, counterfeit, copy or colorable imitation of the SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress in connection with the sale, offering for sale, distribution, or advertising of counterfeit packaged SURGICEL® products or in connection with which such use that is likely to cause confusion, or to cause mistake, or to deceive.

89.    Defendants' actions constitute willful infringement of Plaintiffs' exclusive rights in the SURGICEL trademark, the Ethicon trademarks and the SURGICEL Trade Dress.

90.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm to the valuable SURGICEL trademark, Ethicon trademarks, and SURGICEL Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress, Plaintiffs will continue to be irreparably harmed.

91.    Plaintiffs have no adequate remedy at law that will compensate for the continued and irreparable harm they will suffer if Defendants' acts are allowed to continue.

92.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages to the valuable SURGICEL trademark, Ethicon trademarks, and SURGICEL Trade Dress and other damages in an amount to be proved at trial.

**SECOND CLAIM FOR RELIEF**
**FEDERAL TRADEMARK INFRINGEMENT(15 U.S.C. § 1114(1)(b))**

93.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 86 of this Second Amended Complaint as if fully set forth herein.

94.     In violation of 15 U.S.C. § 1114(1)(b), Defendants, independently and in conspiracy with one another, reproduced, counterfeited, copied or colorably imitated the registered SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress belonging to Plaintiffs and applied such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the offering for sale, distribution or advertising of counterfeit SURGICEL® products or in connection with such use that is likely to cause confusion, to cause mistake or to deceive.

95.     Defendants' actions constitute willful infringement of Plaintiffs' exclusive rights in the SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress.

96.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm to the valuable SURGICEL trademark, Ethicon trademarks, and SURGICEL Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the SURGICEL trademark, the

Ethicon trademarks, and the SURGICEL Trade Dress, Plaintiffs will continue to be irreparably harmed.

97.     Plaintiffs have no adequate remedy at law that will compensate for the continued and irreparable harm they will suffer if Defendants' acts are allowed to continue.

98.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages to the valuable SURGICEL trademark, Ethicon trademarks, and SURGICEL Trade Dress and other damages in an amount to be proved at trial.

**THIRD CLAIM FOR RELIEF**
**FALSE DESCRIPTION AND DESIGNATION OF ORIGIN IN COMMERCE**

99.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 86 of this Second Amended Complaint as if fully set forth herein.

100.     In violation of 15 U.S.C. § 1125(a)(1)(A), Defendants, independently and in conspiracy with one another, in connection with the counterfeit SURGICEL® products, used in commerce a slogan, trade dress, word, term, name, symbol or device, or any combination thereof, or a false designation of origin, false or misleading description of fact or false or misleading representation of fact, which was or is likely to cause confusion or to cause mistake, or to deceive as to an affiliation, connection, or association with Plaintiffs.

101.     Defendants' actions constitute willful infringement of Plaintiffs' exclusive rights in the SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress.

102.     As a direct and proximate result of Defendants' conduct, Plaintiffs

have suffered irreparable harm to the valuable SURGICEL trademark, Ethicon trademarks, and SURGICEL Trade Dress and their reputation in the industry.  Unless Defendants are restrained from further infringement of the SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress, Plaintiffs will continue to be irreparably harmed.

103.    Plaintiffs have no adequate remedy at law that will compensate for the continued and irreparable harm they will suffer if Defendants' acts are allowed to continue.

104.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages to the valuable SURGICEL trademark, Ethicon trademarks, and SURGICEL Trade Dress and other damages in an amount to be proved at trial.

### FOURTH CLAIM FOR RELIEF
### FEDERAL FALSE ADVERTISING

105.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 86 of this Second Amended Complaint as if fully set forth herein.

106.    In violation of 15 U.S.C. § 1125(a)(1)(B), Defendants, independently and in conspiracy with one another, in connection with the sale of the counterfeit SURGICEL® products, used a slogan, trade dress, word, term, name, symbol, or device or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, and qualities of the counterfeit SURGICEL® products.

107.    Defendants advertised, marketed and promoted the counterfeit

SURGICEL® products to the public, and/or to specific segments of the public, using Plaintiffs' SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress, as well as other intellectual property belonging to Plaintiffs.

108.    Defendants' actions constitute willful infringement of Plaintiffs' exclusive rights in the SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress.

109.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm to the valuable SURGICEL trademark, Ethicon trademarks, and SURGICEL Trade Dress and their reputation in the industry.  Unless Defendants' conduct is restrained, Plaintiffs will continue to be irreparably harmed.

110.    Plaintiffs have no adequate remedy at law that will compensate for the continued and irreparable harm they will suffer if Defendants' acts are allowed to continue.

111.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages to the valuable SURGICEL trademark, Ethicon trademarks, and SURGICEL Trade Dress and other damages in an amount to be proved at trial.

**FIFTH CLAIM FOR RELIEF**
**<u>FEDERAL DILUTION OF MARK</u>**

112.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 86 of this Second Amended Complaint as if fully set forth herein.

113.    The SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress are famous and distinctive within the meaning of 15 U.S.C. § 1125(c).

114.     Defendants are selling and/or have sold counterfeit products bearing the SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress after such trademarks and trade dress became famous.

115.     By selling these counterfeit packaged products, Defendants, independently and in conspiracy with one another, have diluted and are diluting the distinctive quality of a mark or trade name owned by Plaintiffs in violation of 15 U.S.C. § 1125(c).

116.     Defendants' actions constitute willful infringement of Plaintiffs' exclusive rights in the SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress.

117.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm to the valuable SURGICEL trademark, Ethicon trademarks, and SURGICEL Trade Dress and their reputation in the industry.  Unless Defendants' conduct is restrained, Plaintiffs will continue to be irreparably harmed.

118.     Plaintiffs have no adequate remedy at law that will compensate for the continued and irreparable harm they will suffer if Defendants' acts are allowed to continue.

119.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages to the valuable SURGICEL trademark, Ethicon trademarks, and SURGICEL Trade Dress and other damages in an amount to be proved at trial.

**SIXTH CLAIM FOR RELIEF**
**FLORIDA DILUTION OF MARK AND INJURY TO BUSINESS REPUTATION**

120.     Plaintiffs reallege and incorporate by reference paragraphs 1

through 86 of this Second Amended Complaint as if fully set forth herein.

121.    The SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress are distinctive within the meaning of Florida Statute § 495.151.

122.    By selling counterfeit products bearing the SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress, Defendants, independently and in conspiracy with one another, have injured and are continuing to injure Plaintiffs' business reputation and/or have diluted and are continuing to dilute the distinctive quality of a mark or trade name owned by Plaintiffs, in violation of Florida Statute § 495.151.

123.    Defendants' actions constitute willful infringement of Plaintiffs' exclusive rights in the SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress.

124.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered irreparable harm to the valuable SURGICEL trademark, Ethicon trademarks, and SURGICEL Trade Dress and their reputation in the industry.  Unless Defendants' conduct is restrained, Plaintiffs will continue to be irreparably harmed.

125.    Plaintiffs have no adequate remedy at law that will compensate for the continued and irreparable harm they will suffer if Defendants' acts are allowed to continue.

126.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages to the valuable SURGICEL trademark, Ethicon trademarks, and SURGICEL Trade Dress and other damages in an amount to be proved at trial.

**SEVENTH CLAIM FOR RELIEF**
**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES**

127.    Plaintiffs reallege and incorporate by reference paragraphs 1
through 86 of this Second Amended Complaint as if fully set forth herein.

128.    In violation of Florida Statute § 501.201 *et seq.*, Defendants,
independently and in conspiracy with one another, are selling, offering for sale and/or
distributing low-quality counterfeit products unlawfully bearing the SURGICEL
trademark, the Ethicon trademarks, and the SURGICEL Trade Dress.

129.    Defendants' conduct is deceptive to ordinary members of the
public and harmful to the public interest.

130.    As a direct and proximate result of Defendants' deceptive conduct,
Plaintiffs have suffered irreparable harm to the valuable SURGICEL trademark, Ethicon
trademarks, and SURGICEL Trade Dress and their reputation in the industry.  Unless
Defendants are restrained from further infringement of the SURGICEL trademark, the
Ethicon trademarks, and the SURGICEL Trade Dress, Plaintiffs will continue to be
irreparably harmed.

131.    Plaintiffs have no adequate remedy at law that will compensate for
the continued and irreparable harm they will suffer if Defendants' acts are allowed to
continue.

132.    As a direct and proximate result of Defendants' deceptive conduct,
Plaintiffs have suffered damages to the valuable SURGICEL trademark, Ethicon
trademarks, and SURGICEL Trade Dress and other damages in an amount to be proved
at trial.

## EIGHTH CLAIM FOR RELIEF
## <u>COMMON LAW UNFAIR COMPETITION</u>

133.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 86 of this Second Amended Complaint as if fully set forth herein.

134.     In violation of the common law of the State of Florida and elsewhere, Defendants, independently and in conspiracy with one another, have unfairly competed with Plaintiffs by selling the counterfeit products.

135.     As a direct and proximate result of Defendants' unfair competition, Plaintiffs have suffered irreparable harm to the valuable SURGICEL trademark, Ethicon trademarks, and SURGICEL Trade Dress and their reputation in the industry.  Unless Defendants' conduct is restrained, Plaintiffs will continue to be irreparably harmed.

136.     Plaintiffs have no adequate remedy at law that will compensate for the continued and irreparable harm they will suffer if Defendants' acts are allowed to continue.

137.     As a direct and proximate result of Defendants' unfair competition, Plaintiffs have suffered damages to the valuable SURGICEL trademark, Ethicon trademarks, and SURGICEL Trade Dress and other damages in an amount to be proved at trial.

## NINTH CLAIM FOR RELIEF
## <u>COMMON LAW UNJUST ENRICHMENT</u>

138.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 86 of this Second Amended Complaint as if fully set forth herein.

139.     By selling the counterfeit products bearing Plaintiffs' valuable

trademarks independently and in conspiracy with one another, Defendants have been unjustly enriched at Plaintiffs' expense in violation of the common law of Florida and elsewhere.

140.    Under principles of equity, Plaintiffs are entitled to restitution and/or disgorgement of Defendants' ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    preliminary and permanently enjoining, each and every one of the Defendants and their subsidiaries, parents, affiliates, agents, servants, employees, members, directors, officers and attorneys and those persons in active concert or participation with them:

(i)    from using any of the SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress, whether genuine or counterfeit, or any marks confusingly similar thereto in connection with the manufacture, sale, offer for sale, distribution, advertisement, or any other use of absorbable hemostats;

(ii)    from using any logo, trade name or trademark confusingly similar to any of the SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress which may be calculated to falsely represent or which has the effect of

falsely representing that the services or products of

Defendants or of others are sponsored by, authorized by, or

in any way associated with Plaintiffs;

(iii) from infringing any of the SURGICEL trademark, the

Ethicon trademarks, and the SURGICEL Trade Dress;

(iv) from otherwise unfairly competing with Plaintiffs in the

manufacture, sale, offering for sale, distribution,

advertisement, or any other use of SURGICEL® products;

(v) from falsely representing themselves as being connected

with Plaintiffs or sponsored by or associated with Plaintiffs

or engaging in any act which is likely to cause the trade,

retailers and/or members of the purchasing public to

believe that Defendants, or any of them, are associated with

Plaintiffs;

(vi) from using any reproduction, counterfeit, copy, or colorable

imitation of any of the SURGICEL trademark, the Ethicon

trademarks, and the SURGICEL Trade Dress in connection

with the publicity, promotion, sale, or advertising of

absorbable hemostats;

(vii) from affixing, applying, annexing or using in connection

with the sale of any goods, a false description or

representation including words or other symbols tending to

falsely describe or represent such goods as being SURGICEL® products and from offering such goods in commerce;

(viii)   from diluting the SURGICEL trademark, the Ethicon trademarks, and the SURGICEL Trade Dress;

(ix)   from destroying any records documenting the manufacture, sale, offer for sale, distribution, advertisement or receipt of any product purporting to be SURGICEL® products; and

(x)   from assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (ix) above; and

B.   ordering that, within fifteen days after the entry and service of a preliminary or permanent injunction, Defendants serve and file a written report under oath setting forth in detail the manner and form in which they have complied with the injunction; and

C.   ordering that all infringing material be turned over, seized, impounded and/or destroyed; and

D.   awarding to Plaintiffs punitive damages from each Defendant in an amount to be ascertained at trial, but in no event less than $25 million; and

E.   awarding to Plaintiffs statutory or actual damages in an amount to be ascertained at trial, and costs and attorney's fees; and

- 39 -

F.      awarding to Plaintiffs an accounting, and an award of: (i) all ill-gotten profits from Defendants' manufacture, sale and/or distribution of the counterfeit SURGICEL® products; (ii) Plaintiffs' lost profits; and (iii) Plaintiffs' remedial costs; and

G.      awarding to Plaintiffs pre-judgment and post-judgment interest; and

H.      awarding such other and further relief to Plaintiffs as may be just, proper, and equitable.

Dated:          October 2, 2019

                                   Respectfully submitted,

                                   */s/ Alice R. Huneycutt*
                                   ALICE R. HUNEYCUTT
                                   Florida Bar No. 293105
                                   STEARNS WEAVER MILLER WEISSLER
                                     ALHADEFF & SITTERSON, P. A.
                                   SunTrust Financial Centre, Suite 2100
                                   401 E. Jackson Street (33602)
                                   Post Office Box 3299
                                   Tampa, Florida  33601
                                   Telephone:  (813) 222-5031
                                   Facsimile:  (813) 222-5089
                                   Primary:  ahuneycutt@stearnsweaver.com
                                   Secondary:  mkish@stearnsweaver.com

                                   and

                                   GEOFFREY POTTER
                                   Trial Counsel
                                   ARON FISCHER
                                   TIMOTHY WATERS
                                   JOSHUA R. STEIN
                                   PATTERSON BELKNAP WEBB & TYLER LLP
                                   1133 Avenue of the Americas
                                   New York, NY  10036-6710
                                   Telephone:  (212) 336-2000
                                   Fax:  (212) 336-2222
                                   gpotter@pbwt.com
                                   afischer@pbwt.com
                                   twaters@pbwt.com
                                   jstein@pbwt.com

                                   *Attorneys for Plaintiffs Johnson & Johnson,*
                                   *Ethicon, Inc., and Ethicon US, LLC*